Turn to our next case to be argued, 22-2971, Merrill v. Hyman. All right. Counsel, you've reserved three minutes for rebuttal. You may proceed when you're ready. Yes. Good morning. May it please the Court? I'm Robert Fesser, counsel for Appellant Suzanne Merrill in this matter. And in our view of the case, it's relatively simple. Both sides agree that the issue is the nature of the grant that was made by Bob Merrill to the Hymans in what we call the 1963 agreement. My view or our view certainly is that was a grant of the grand rights to the lyrics of Funny Girl. We base that upon the fact that it was a grant not only of royalties or consideration as the other side has argued, but that it granted two-thirds interest in the results of all of Bob Merrill's services in connection with writing the lyrics for Funny Girl. And then to make it more emphatic, in paragraph six of the 1963 agreement, they specifically accepted from the grant the small performance rights. In other words, the use of the songs individually other than as together to present the play. And I believe that it had been well established by that time. Why shouldn't one read that the way it most sounds as if they wanted to get more money early. And so they made a deal with respect to the royalties. And many years later, they in fact said in 1914 that they hadn't given anything else. If I may correct that the record is that three years later. I know the TAM moment could be read either way, frankly, could be read either way. But later on in 2014, I mean, even if we say this is ambiguous, they said. But what happened in 2014 or 2015 was Mrs. Merrill signed the document, but it had nothing to do. None of the original signers of this 1963 agreement were alive at that point. So what she may or may not have understood didn't matter at that point. She couldn't have changed. She couldn't have changed what was done in 1963 if she wanted to. May I ask you this? Let's suppose just for argument's sake that you're right and that Bob Merrill transferred both a right to royalties and a copyright right. Even if that's correct, why do you prevail here? If the royalty portion of it is not subject to termination as a non-copy because it's a non-copyright right, what difference does it make that the agreement also happened to transfer terminable rights? Why do they travel together? Right. It may. Let me see how I can approach that. It would be a transfer. It would just divide the transfer in half if it were to be that way. The transfer was a one continuous sentence transfer which included all of the services, you know, the rights derived from Mr. Merrill's services. That becomes a transfer of the grand rights. It's they now own two-thirds of the grand rights, and they confirmed that in 1966. What does that mean, to own two-thirds of the rights? Well, the Copyright Act allows recapture or termination of rights of any interest in a copyright. It doesn't have to terminate the whole copyright. But just in a practical sense, what does it mean to own two-thirds? Well, any time the play is staged and derives income, that's an exercise of the grand rights by the copyright holder. The copyright holders collectively would be entitled to payment. Now, it's very important to note that they could not individually go out and license the rights because you cannot. It's been well established for many, many years, I believe, under the Copyright Act that you can't grant an exclusive license unless you have all of the interests in the copyright. Do you agree that if somebody simply gave something in exchange for royalties, for payments of a sort, that cannot be done away with now and would remain in effect and continue to have its effect? If this were a simple transfer of the royalties, yes. Yes. Yes. So if it were both, then what are the consequences? Well, the consequences are that if the right granted was not a simple right in the royalties, but all of the proceeds from the services which generated the grand rights for the play, and that's a copyright interest, you terminate that and nothing would be left. You base this on the notion that there was the word right in the 1963 agreement. Right. But is that a right to financial payment, or is it a right? It's a right that derives from the services he provided, which enabled him to get the copyrights. There would be no copyright if he hadn't written the lyrics. That's the whole purpose. And these were not simple individuals. These were three people who were obviously familiar with the business of Broadway plays. And they, in 1966, decided what representative warranted and what that agreement meant. Now, the trial court said, well, the Hymens, if they said that, they did it in error. But that also meant that the other person to that contract, Bob Merrill, was doing it in error. These three people knew exactly what they had done. They confirmed it three years later. They lived with it for years until the rights were terminated properly, we say, under Section 304 of the Copyright Act. I take it there's no extrinsic evidence of anything other than royalties having been in practice transferred, used by the recipient, if you will, after the transfer. It's only in practice this has just been about royalties. There's no other evidence in the record. Doesn't the word two-thirds naturally itself suggest that it's two-thirds of a calculation, which is to say something like a royalty stream as opposed to two-thirds of a more intangible intellectual property right? But because they had granted two-thirds of the copyright interest in the grand rights, it was absolutely necessary for all three of them to agree to that in the TAMS license agreement. No one interest could have licensed TAMS the rights to use the lyrics as part of the play Funny Girl to tour all over the country. It had to be the three of them. It's a whole. The grand rights were a whole. And that's exactly what they say in 1966. Thank you, Mr. Bassler. You have three minutes remaining for a rebuttal. We'll hear from opposing counsel. May it please the court. Your honors, good morning. Mark Herman on behalf of the defendants. Your honors, the plaintiff asks this court to buy into an argument that doesn't quite make much sense. As Judge Meyer held, if we were to construe the word rights as copyrights, many of the terms of the 1963 agreement simply wouldn't make much sense. So what does it mean? The word rights. What does it unambiguously mean, I suppose, is the better question. It's referring to a stream of income. A stream of income that would flow from the exploitation of the copyrights. And the reason that we know that, Your Honor. You say financial rights, not copyright. Correct, Your Honor. Financial rights. And the reason that we know that is that the quartet of terminology used in the 1963 agreement, royalties, percentage compensation, rights, and the catch-all term other compensation, cannot reasonably read any other way. Other compensation tells the reader clearly that what the drafters had in mind here was that we are referring to a stream of income and nothing else. In other words, the other compensation is a textual clue as to what everything that preceded it, the nature of everything that preceded it. It's a monetary thing. That's correct, Your Honor. And there's similarly other evidence littered all the way throughout the 1963 agreement. What other monetary thing could there be other than royalties and percentage compensation? What else could that potentially mean, though? I don't believe that the stream of revenue that would be received by the Hymans would be anything other than percentage compensation and royalties. Now, the drafters. Right, but we're trying to assign meaning to the extra word in the agreement, rights. And if rights simply means the two things that preceded it, that's an unnatural way to read a contract. We have to assume that it must mean something additional, even if it's of a compensation character. I'm asking you whether you have any thought as to what other than royalties and percentage compensation rights potentially could refer to. I don't think that the contract itself gives insight into that, but I think it does give us a clue. The lack of a comma after rights and the fact that it's linked together with other compensation, to me, would suggest that rights means some kind of other compensation. And perhaps it's a redundancy, Your Honors. I don't think that by reading rights as some type of financial compensation or stream of revenue would be rendering any term meaning. You said it might be a redundancy. You can't, I gather from your response to Judge Engelmeyer, you can't think of a possible example that would suggest that it's not a redundancy, right? Without speculating, Your Honor. Feel free to speculate, even. Still no. May I just ask you, just to come back to a question that came up with your adversary, let's suppose just for argument's sake that your adversary was right and that the word rights in fact referred to a protected right under the Copyright Act. Even so, wouldn't you have an argument, although you don't make it, that the royalties, which was the only thing that I gather was attempted to be terminated by Suzanne Merrill, the royalties would be non-terminable. These would be severable, separate questions. I think that's right, Your Honor. I think from a practical perspective, the consequence would be the same. Why didn't you make that argument, that these would have been severable, that this whole interpretive question was in a sense irrelevant? I didn't make that argument, Your Honor, because I thought that it was so plain and obvious from the language of the 1963 agreement that no reasonable reader would construe the 1963 agreement as conveying anything other than financial rights. But to Your Honor's point, I agree that to the extent that the royalty rights and the copyrights do travel together, the practical consequence for the purposes of today's proceeding would be the same. But why would one write a contract that had two separate things which then didn't make any difference? Why isn't that an argument in favor of your reading of a contract? But it makes no sense because if it doesn't make any difference, if they are two things, why would you do it? There's probably Latin for that question. But to Your Honor's point, I think that if we did want to look at extrinsic evidence, and to be clear, my position is that extrinsic evidence is irrelevant here and should not be considered. But to the extent that there is any ambiguity in the 1963 agreement, I think as Judge Meyer correctly held, we can see what a copyright deal looks like by way of the joint venture agreement. We can see what an exclusive license looks like by way of the 1966 Towns Whitmark agreement. Those agreements use the nomenclature that are typical in licensing agreements and conveyances of copyright ownership, and we don't see anything similar in the 1963 agreement. It very clearly is a royalties agreement and doesn't convey anything other than that. And the point I wanted to hit on, Your Honors, is the preamble to the 1963 agreement. I think it's important to recognize and appreciate the directional flow of rights to make sense of all of this. The preamble references the joint venture agreement that was entered into simply months before the 1963 agreement. And what is clear is that Bob Merrill received contractual rights from the joint venture. Those contractual rights were the rights to receive royalties, percentage compensation, and other compensation in the joint venture agreement. And we see the directional flow of those rights in the 1963 agreement. Bob Merrill simply carved off two-thirds of those rights and said to Elliott Hyman, you can take these rights, but in return, I would like an advance. Because ultimately, Your Honors, this was a risk. Nobody knew how successful Funny Girl was going to be, and as Judge Meyer correctly held, this was an investment by the Hymans, an investment that could have paid off but may not have paid off. And it's an investment that, taking into account inflation, surmounted past $800,000 for this two-thirds of a right. So it's not as though Bob Merrill didn't receive anything for this right. So I think that the preamble helps to add context to the directional flow of the rights. I had also mentioned, Your Honors, that the rest of the 1963 agreement is littered with terms that give us reassurance that this agreement was about financial rights and nothing more than financial rights. And that's contained in paragraph one, for example, where it says including but not limited to, and then it goes off to provide a litany of examples of compensation and royalties that could stem from the exploitation of the copyright. Interestingly, paragraph 11 references the obligation of both parties to maintain books and records so that each of the parties can maintain a close eye on how much revenue is actually being generated, which, again, I think underscores the point that the only interest that was being bargained for here was a financial right. And the parties made it. But doesn't that just suggest that some of the interest was a financial right? You said only. Why would that suggest only? Because I think, Your Honor, if this agreement was indeed conveying some kind of copyright interest, I'm not quite sure I see the relevance of maintaining books and records to ensure that the royalties that were being received from the exploitation of that right were accurate and up to date. That's the reason I reached that conclusion, that I think paragraph 11, again, underscores the point that this was only about financial rights and nothing else. My adversary places much emphasis on the 1966 licensing agreement. And to be clear, Your Honors, my position is that the 1966 licensing agreement is irrelevant, extrinsic evidence that need not and should not be considered. But to the extent that extrinsic evidence is considered, as Your Honor correctly identified earlier, the 2014 licensing agreement, I think, sheds very clear light on what the positions of the parties are. It was in that agreement. Yeah. Opposing counsel says this was not one of the parties. Is your argument that, after all, she was part of a family and would know what was understood? That's correct, Your Honor. My position would be that this should be construed as an admission by Mr. Merrill. Well, admission is too strong, but evidence of what people in the family thought had been done. Yes, Your Honor. I agree with that sentiment, indeed. So at this time, Your Honors, unless Your Honors have any further questions, I submit that the 1963 agreement is plain and unambiguous on its face, and this court should affirm the trial courted in its entirety. Thank you. Thank you. All right. Mr. Vestry, you have three minutes. Yes. Very briefly, counsel ignores other provisions of the 1963 agreement. It's very important to consider the provisions of paragraph 6 of the 1963 agreement, which make it very clear that Bob Merrill is reserving to himself these small performance rights. And as this court in the Stigwood case that we cited at length held many years ago, there is both grand rights and small performance rights that are handled by entities such as ASCAP and BMI. But here, Bob Merrill reserves to himself specifically the right to use the individual songs, not the right to use the songs in any other way, the lyrics for the songs in any other way. And insofar as they're used as part of the musical itself, the Highmen share two-thirds of it. And I don't think there's any question of that. And those two-thirds rights are the grand rights. That is an interest in a copyright. It doesn't have to be. When you recapture a copyright or terminate a grant of copyright interest, you don't have to terminate the whole copyright or all the individual rights. But here, the right granted to the Highmen was covered by Section 4 of the Copyright Act of 106. May I ask? Sure. So on the 1963 agreement, we're obviously focused, J13, on the second whereas clause. You have it? So my question is the prior paragraph, which is reference to the prior agreement that Merrill has entered into, for which he's to receive, and then it lists the same thing. So what does rights refer to there? What rights did he receive? In the prior agreement, among other things, he retained his copyrights. But what did he receive? What rights did he receive? He received compensation. Certainly, he received royalties and compensation. But it's received as a result of his services. And even the trial court here says- Right, but it says received royalties, percentage compensation, comma, rights. And so I'm asking what is that word rights mean in that paragraph? He retained his copyright under the basic production contract. It specifically says- So their rights means retainment. It would mean his rights and the copyrights, which he earned as a result of providing the services of writing the lyrics. If he hadn't written the lyrics, there would be no copyright. Isn't that an odd way of saying that in the middle of all the other things? I mean, I don't mean it's impossible, but isn't it a little odd? That agreement that they signed was a form agreement that the Dramatists Guild provided. And it says so in the agreement. It even cites its own copyright of that agreement. And it's a long, complicated agreement. They then go to specifically- They add a new paragraph, 10th, which covers all of what we're talking about, the rights he received, what he retained in his copyright as a result of the services he granted. So these are three gentlemen that knew their way around the business of performing or producing plays. They knew exactly what they were doing, and they said so three years later. This is exactly what we did. What do you make of the statement that I made with opposing counsel that, of course, the daughter was not the one who signed, but over these 50, 45 years, why wouldn't she have known what was going on? It wasn't the daughter. I mean, yeah. It was his wife at the time. She was not involved in his business whatsoever. She submitted a declaration to the trial court that didn't come up in any of these briefs, but it's in the record. And she couldn't have changed anything at that point if she wanted to. No, I'm not saying that she couldn't have changed. But I must say that I do much of certain business, but my wife knows what's going on. And if I didn't make that clear, I'd be in a lot of trouble. But here's what you have. You have a gentleman in Bob Merrill who had a unique talent to write lyrics for songs. And he wrote some great songs over the years. His wife had nothing to do with that. As a matter of fact, we knew Bob Merrill before he died. I mean, our law firm did. But as a matter of fact, he developed a very unique way to create music. He couldn't play any instruments, so he went into a toy store and bought one of those xylophones where you can, you know, bang it like that. That's how he would sound out the music and write lyrics to it. And he was a brilliant lyricist, and he knew exactly what he was doing because he had written lyrics for any number of Broadway plays. And he intended to sell to the Highmans two-thirds of his interest. And his interest included certainly the grand rights and the copyright. Thank you. Thank you, counsel. Thank you to both sides. Appreciate your arguments. The matter is submitted. We'll take it under advisement.